**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

SECURITIES AND EXCHANGE
COMMISSION,

                                    Plaintiff,

            v.

MICHAEL STAISIL,

                                    Defendant.

Case No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

**NATURE OF THE ACTION**

1.      This matter involves the fraudulent efforts of Defendant Michael Staisil ("Staisil") to recruit investors for Kevin Merrill ("Merrill"), one of the perpetrators of a Ponzi-like scheme that raised more than $345 million from over 230 investors.

2.      From at least 2013 to September 2018, Merrill and Jay Ledford ("Ledford"), through companies they owned and controlled, including Global Credit Recovery, LLC ("GCR"), offered and sold investments purportedly relating to the purchase of consumer debt portfolios (the "Merrill-Ledford Scheme").

3.      From early 2016 to 2018, Staisil was one of Merrill's key lieutenants in securing investments in GCR, ultimately helping raise approximately $75 million for the Merrill-Ledford Scheme.

4.      Staisil successfully sold investments in GCR, in part, by presenting himself to investors and potential investors as a wealthy businessman with a history of Wall Street success.

He boasted about his multiple homes, his business acumen, a successful "family office" with tens of millions of dollars under management, and, most importantly, his outstanding experience investing in GCR.

5.      Reality was in stark contrast to the fantasy Staisil projected.  Staisil had not held a steady job or had a reliable source of income since 2008.  He did not own multiple homes; he rented a house in New Jersey.  Staisil had no "family office," nor any money with which he could have funded a family office.

6.      Other than the money that he made selling investments in GCR, Staisil generally lived off the largesse of his friends and family.  Staisil did not even maintain a bank account in his own name.

7.      Contrary to the stories he told to potential GCR investors, Staisil never invested a single cent of his own money in GCR.

8.      Staisil's facade that he was a successful GCR investor bolstered his claim that GCR was a golden investment opportunity and hid his true motivation in pitching the investment:  Merrill was paying him to bring in GCR investors.

9.      Staisil made sure Merrill understood how hard he was working, sending him a stream of updates on his efforts to recruit and "close" investors, often linked to requests for money from Merrill.

10.      In his efforts to secure GCR investments, not only did Staisil misrepresent his own personal and investing history, he also misrepresented basic facts about GCR.  Among other things, Staisil falsely represented to prospective investors and individuals who helped find prospective investors that GCR had secured some $50-100 million more in financing than it

actually had and he disseminated false information that GCR had a sophisticated management team that was in fact nonexistent.

11.     Staisil worked with Merrill to obtain investments in GCR despite knowing that investor money would not be used as represented and without revealing those facts to potential investors.

12.     Staisil did this because Merrill told him that if he brought in investors, Merrill would pay him.

13.     Staisil received approximately $400,000 from Merrill for his efforts.

14.     At all relevant times, Staisil held no securities licenses, was not registered with the Commission, and was not associated with registered broker-dealers, nor did he qualify for an exemption.  Staisil thus was not permitted to sell securities.

15.     By engaging in the conduct described in this complaint, Staisil violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R § 240.10b-5], and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

**JURISDICTION AND VENUE**

16.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. § 77t(b) and 77t(d)] and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. § 78u(d) and 78u(e)] to enjoin acts, transactions, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil penalties, and such other and further relief as the Court may deem just and appropriate.

17.     The Court has jurisdiction over this action pursuant to Sections 20 and 22 of the

Securities Act [15 U.S.C. §§ 77t and 77v], and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

18.     Venue lies in this judicial district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within this district, including that Staisil made material misrepresentations and omissions and engaged in deceptive conduct for the purpose of selling securities related to GCR, a Maryland limited liability company with its principal place of business in Towson, Maryland, during the period of the Merrill-Ledford Scheme.  In addition, as part of the misconduct described herein, Staisil transacted business with Merrill, at the time a resident of the District of Maryland, during the period of the Merrill-Ledford Scheme.

**DEFENDANT**

19.     **Michael Staisil**, age 52, is a resident of New York, New York.  He is not registered with the Commission in any capacity.  Staisil was previously associated with a formerly registered broker-dealer, Montgomery Securities, in the mid-1990s.

**RELEVANT INDIVIDUALS AND ENTITY**

20.     **Kevin Merrill**, age 55, was one of the perpetrators of the Merrill-Ledford Scheme, as alleged in *SEC v. Merrill, et al.*, No. 18-cv-2844-RDB (D. Md.) (the "Merrill Action").  Merrill has consented to liability for the violations of the securities laws alleged in the Merrill Action.  In *United States v. Merrill, et al.*, No. 18-cr-465-RDB (D. Md.), Merrill was criminally charged by the United States Attorney's Office for the District of Maryland for his misconduct related to the Merrill-Ledford Scheme.  Merrill pled guilty to wire fraud and conspiracy to commit wire fraud, and was sentenced to 22 years of imprisonment.  Merrill is

currently incarcerated at FCI Allenwood Low in Allenwood, Pennsylvania.

21.     **Jay Ledford ("Ledford")**, age 56, was another perpetrator of the Merrill-Ledford

Scheme, as alleged in the Merrill Action.  Ledford has consented to liability for the violations of

the securities laws alleged in the Merrill Action.  In *United States v. Merrill, et al.*, No. 18-cr-

465-RDB (D. Md.), Ledford was criminally charged by the United States Attorney's Office for

the District of Maryland for his misconduct related to the Merrill-Ledford Scheme.  Ledford pled

guilty to conspiracy to commit wire fraud, aggravated identity theft, and engaging in a money

laundering transaction in excess of $10,000, and was sentenced to 14 years of imprisonment.

Ledford is currently incarcerated at FCI Safford in Safford, Arizona.

22.     **Global Credit Recovery, LLC** was a Maryland limited liability company with its

principal place of business in Towson, Maryland during the period of the Merrill-Ledford

Scheme.  Until September 2018, Merrill owned, controlled, and was the managing member of

GCR.  GCR was the entity through which Merrill primarily operated the Merrill-Ledford

Scheme, using GCR to sell purported investments in consumer debt portfolios.  The Commission

charged GCR with violations of the securities laws in the Merrill Action, and on September 13,

2018, the United States District Court for the District of Maryland appointed Gregory S. Milligan

as the receiver over GCR.

**FACTS**

**I.     The Merrill-Ledford Scheme**

23.     From at least 2013 to September 2018, Merrill and Ledford, directly, and through

entities under their control, raised at least $345 million from more than 230 investors,

representing that they would use investor money to purchase consumer debt portfolios.

24.     Merrill and Ledford spent only a fraction of the money they raised to purchase

debt portfolios, as they had promised.  Instead, they misappropriated approximately $87 million for themselves and used approximately $213 million to make Ponzi-like payments to investors to maintain the scheme.

25.     Merrill's role in the Merrill-Ledford Scheme involved recruiting new investors or convincing existing investors to make additional investments.

26.     Merrill bolstered his fundraising efforts by engaging other people, including Staisil, to offer and sell securities for GCR.

**II.     Staisil Offered and Sold GCR Securities and Merrill Paid Staisil for His Efforts**

27.     Staisil has not had steady employment since 2008.

28.     From early 2016 to September 2018, Staisil recruited investors for GCR.  Merrill promised to pay Staisil 5% of any funds that Staisil raised upon receipt of the investment.

29.     Staisil mined his contacts, working with a friend, Associate A, to find new potential investors.

30.     Staisil met with potential investors, answered questions, and provided information about GCR, including information for investors wishing to conduct due diligence on investing in GCR.  Staisil also opined on the merits of investing in GCR and helped encourage investors to invest more money.

31.     Staisil provided frequent updates to Merrill regarding Staisil's investor-recruitment activities by informing Merrill of his meetings with potential investors, providing Merrill with his assessments of individuals as prospective investors, and conveying how much money such prospective investors might be willing to invest and on what terms.

32.     Merrill and Staisil continuously focused on securing additional investments in GCR, encouraging each other to "ABC," or "Always Be Closing."

33.     Staisil's investor recruitment efforts were fruitful for GCR and for himself.

34.     Staisil personally recruited individuals and entities that invested at least $15 million into the Merrill-Ledford Scheme.

35.     Staisil also helped Merrill secure investments from institutional investors, bringing another approximately $60 million into the Merrill-Ledford Scheme.

36.     Starting in early 2017, Merrill, through GCR and another company that he owned and controlled, paid Staisil approximately $400,000 for securing new investments into the Merrill-Ledford Scheme.  Staisil asked Merrill to direct the payments to an entity that, on paper, he did not control but to whose bank accounts he had access.

37.     Staisil regularly requested payments from Merrill and linked such requests to Staisil's efforts to sell GCR investments.

38.     In one instance, Staisil gave Merrill a list of investors he had helped recruit for GCR and then immediately thereafter asked Merrill for money.

39.     In another instance, after Merrill told Staisil he would wire him money, Staisil wrote, "Thank you for the wire!! Our system is working with all the individuals and family offices ... over $11 million. Now just need to close a few big ones!!!!"

40.     Merrill promised Staisil that, if he secured new funds from prospective investors, he would "give [Staisil] a piece immediately."

41.     During the period of Merrill-Ledford Scheme, Staisil was not registered with the Commission in any capacity and was not associated with a registered broker-dealer.

III.    **Staisil Made Material Misrepresentations and Omissions and Engaged in Deceptive Conduct in Recruiting Investors for Merrill and GCR**

A.      **Staisil Falsely Represented to Prospective Investors His Own Wealth and Purported Profitable Investment in GCR**

42.     In making his pitch to investors, Staisil falsely represented that he was a wealthy, successful businessman who had profitably invested his own money in GCR.

43.     In May 2018, Staisil attended a meeting near Dallas, Texas with Merrill, Ledford, and others, including an individual whom Staisil, Merrill, and Ledford understood to be a prospective investor in the Merrill-Ledford Scheme ("Prospective Investor").

44.     Staisil told Prospective Investor that he was an investor with a home in New Jersey and an apartment in New York City, and ran a family office that had successfully invested millions of dollars in GCR for a number of years.  The only truth in any of these statements was that Staisil lived in New Jersey—the rest were lies.

45.     In reality, prior to the meeting with Prospective Investor, Staisil complained to Merrill:  "I'm negative in my account.  I can't even book a flight to Dallas."

46.     Staisil also represented to Prospective Investor that he and his purported family office had $30-45 million of their own money invested in GCR.  These statements were false because Staisil had no family office and no money invested in GCR.

47.     In his pitch to Prospective Investor, Staisil detailed his purported history of investing with Merrill, representing that, when he first started investing with Merrill, he had many investments, but over time, had begun concentrating his investments with Merrill because the risk-reward profile "has been awesome."

48.     None of this was true.  Staisil had never invested money with Merrill or any of Merrill's companies.  Staisil's assessment of GCR's risk-reward profile, purportedly based on his personal investing experience, was false and misleading.

49.     In fact, GCR was a fraudulent enterprise, and rather than purchasing debt portfolios as promised, Merrill used investors' money to fund his lavish lifestyle and repay prior investors.

50.     Staisil further misrepresented his purported returns from investing in GCR to Prospective Investor, stating that GCR's projections of actual returns had been "spot on" and that gave him "a lot of comfort as an investor."

51.     Staisil had never been a GCR investor and, contrary to his representations, lacked the personal experience of observing that GCR actually achieved its projected returns.

52.     Staisil made similar misrepresentations regarding his purported investment in GCR to other potential investors, including to his friend, Associate A, a GCR investor with whom Staisil worked to recruit additional GCR investors.

53.     On one occasion, when Staisil apparently had run out of money, he complained to a Merrill associate, Associate B, noting that he could turn to Associate A for financial support but that would expose that he had not invested in GCR.  Staisil wrote to Associate B that Associate A "thinks we are all crushing it from [K]evin [Merrill].  I ask him for money.  It's over."  Associate B responded:  "Why can't you just be honest with [Associate A] about your situation?  You haven't invested a $ with Kevin."

**B.     Staisil Made False Statements and Disseminated False Information About GCR to Potential Investors**

54.     In his efforts to find investors for GCR, Staisil made false statements designed to inflate GCR's success and portray GCR as a far more sophisticated operation than it was in reality.

55.     In October 2017, Staisil sent an email to prospective investors and individuals who could help him find prospective investors in an attempt to sell GCR securities.

56.     In this email, Staisil stated that GCR had secured $25 million of funding from a foreign bank owned by a New York-based family office (the "Foreign Bank")—this much was true—but then falsely represented that the Foreign Bank was in the process of increasing its funding by another $50 million, for a total of approximately $75 million invested in GCR.

57.     Staisil knew at the time of this email that the Foreign Bank was not in the process of allocating another $50 million with GCR because he knew that the Foreign Bank had terminated its investment in GCR.

58.     In January 2018, Staisil sent another email to prospective investors and individuals who could help him find prospective investors, again attempting to raise investor money for GCR.

59.     In this email, Staisil falsely represented that Foreign Bank had increased its allocation to GCR by $50 million, to $75 million total.

60.     At the time of this email, Staisil knew that the Foreign Bank had terminated its investment with GCR.

61.     In the same January 2018 email, Staisil stated that GCR had secured a $30 million investment from a private equity fund—again, this much was true—but then falsely represented the fund also would invest another $100 million, for a total of $130 million invested in GCR.

62.      At the time of this email, Staisil knew that the fund had not agreed to an additional $100 million investment and that no such agreement was imminent.

63.     Staisil made similar misrepresentations to other prospective investors and individuals who could help him find prospective investors.

64.     Staisil also attached a presentation prepared by Merrill, containing information regarding GCR, to his emails to prospective investors and individuals who could help him find prospective investors.

65.     This presentation contained a page that purported to provide biographical information for GCR's management team.  In addition to short biographies of Merrill and Ledford, it also provided information listing Associate B as GCR's chief financial officer and another individual, Associate C, as GCR's director of quantitative research.

66.     Staisil knew that Associate B was not GCR's chief financial officer and that Associate C was not GCR's director of quantitative research.  Staisil understood that GCR had no chief financial officer or director of quantitative research.

67.     The same presentation contained additional false information about GCR, including regarding GCR's profitability and operations.

68.     On more than one occasion, Staisil used this presentation to recruit investors to GCR without making any attempt to ascertain whether any of this additional information was true.

**C.      Staisil Offered GCR Securities Without Disclosing to Potential Investors that Merrill Misrepresented the Terms of GCR Investments, Including His Use of Investor Money to Pay Staisil**

69.     Staisil offered investments in GCR without disclosing to potential investors that Merrill planned to use investor money in ways other than those represented, including to pay Staisil.

70.     Staisil knew that the structure of the purported investments in securities was such that all investor money was to be used for the purchase of debt portfolios.

71.     Staisil understood that Merrill was not using investors' money as represented to prospective and current investors.

72.     Staisil understood that the source of payments he received from Merrill was investor money because Merrill told Staisil several times that he (Merrill) could not pay him until an investor wired money to Merrill.

73.     In one instance, after Staisil asked Merrill for $75,000, Merrill responded that he did not have that much to send Staisil but would "send more as soon as we get the next deposit." Merrill then encouraged Staisil to continue his efforts to bring in new investors.

74.     Shortly before the May 2018 Dallas meeting with Prospective Investor, Staisil asked Merrill for money.  Merrill responded that he did not have the money to send but that he "hop[ed] we close [Prospective Investor] and I can wire you."

75.     Staisil attended the meeting with Prospective Investor in an effort to convince him to invest in GCR.  Staisil falsely presented himself as a disinterested investor whose role in attending the meeting was to share his personal experience investing in GCR.  In fact, Staisil had not invested in GCR and hoped to be paid by Merrill with a portion of Prospective Investor's investment, which he did not reveal to Prospective Investor.

76.     Staisil also understood that Merrill would not abide by the terms of other investor agreements and nevertheless continued to offer GCR securities.

77.     In May 2018, Merrill and Staisil participated in a pitch call with a firm that Staisil had recruited to help find financing for GCR.

78.     Staisil understood that Associate B had been unwilling to participate in the call because Associate B understood that the call violated an exclusivity agreement that Merrill had made with another potential GCR investor.

79.     After Merrill expressed to Staisil his view that the call had gone well, Staisil

agreed and continued:  "And f***ing [Associate B] wouldn't do that call due to his morality!!

We have no time to waste!!  It's go time every second of every day!!!!"

**D.      Staisil Concealed, and Encouraged Merrill to Conceal, the Foreign Bank's**
**         Dissatisfaction with GCR and Schemed with Merrill to Repay the Foreign**
**         Bank with Another Investor's Money**

80.     Staisil routinely used the Foreign Bank's investment as a selling point in offering

GCR securities to potential investors, without disclosing that the Foreign Bank had terminated its

investment with GCR.

81.     Shortly after falsely representing that the Foreign Bank was in the process of

increasing its investment to $75 million, Staisil told Merrill that a potential investor might invest

if that investor was not told that the Foreign Bank had terminated its investment.

82.     A day later, Staisil advised Merrill to conceal from Associate A, with whom

Staisil recruited GCR investors, that Foreign Bank had terminated its GCR investment because

Staisil thought that it might worry Associate A.  Merrill confirmed he had not conveyed this

information to Associate A.

83.     At that point, Associate A had invested approximately $1.5 million of his own

money in GCR and would invest another $250,000 by the time Merrill and Ledford were

arrested.  He also helped raise another $12 million for GCR from other individual investors.

84.     In the summer of 2018, Staisil strategized with Merrill about using newly raised

investor money to pay the Foreign Bank the outstanding balance on its $25 million investment.

85.     During the May 2018 meeting with Prospective Investor, Merrill offered him a

$10 million investment in a purported auto loan portfolio.

86.     After the meeting, Merrill told Staisil that he wanted to pitch Prospective Investor on a second $10 million deal, so that Merrill could collect a total of $20 million from Prospective Investor by the end of that month.

87.     Merrill then told Staisil that, if this pitch to Prospective Investor was successful, Merrill would propose repayment terms to the Foreign Bank and would use Prospective Investor's money to make a single repayment to the Foreign Bank at the end of the month, but at less than the full amount owed to the Foreign Bank.

88.     Staisil concurred, outlining the following plan to Merrill:  "I think we get [Prospective Investor's] money in and then you give [the Foreign Bank] an exploding offer!" Staisil then proposed that, if the Foreign Bank agreed to this offer, Merrill should wire the Foreign Bank the money from Prospective Investor the same day.

89.     Staisil knew or was reckless in not knowing that GCR would not be able to purchase the debt portfolio investments being offered to Prospective Investor if it used his money to instead repay the Foreign Bank.

## IV.     Staisil Violated the Securities Laws

90.     The investments in purported debt portfolios that were offered and sold by Staisil, Merrill, GCR, and others as part of the Merrill-Ledford Scheme (the "Securities") were securities within the meaning of the Securities Act and Exchange Act.

91.     These investments were all in a common enterprise run by Merrill, GCR, and others, with the expectation of profits to be derived solely from the efforts of Merrill, GCR, and others who were managing and operating the Merrill-Ledford Scheme.  Investors played no role in management or operations of any of the businesses that were part of the Merrill-Ledford Scheme.

92.     Staisil, Merrill, GCR, and others sold the Securities as investments and the purchasers of the Securities invested with the expectation of profit.

93.     Staisil, Merrill, GCR, and others offered and sold the Securities to hundreds of individual members of the general public, including those individuals who pooled their money to purchase the Securities.

94.     The Securities are not subject to any other regulatory scheme that significantly reduced the risks inherent in their purchase.

95.     Staisil engaged in the conduct described herein by use of the means or instruments of transportation or communication in interstate commerce, the instrumentalities of interstate commerce, and/or by use of the mails.

96.     Staisil made material untrue statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

97.     A reasonable investor would consider the misrepresented facts and omitted information—including but not limited to misrepresentations and omissions regarding the use of investors' money to pay Staisil and plans to use it repay an existing investor, the Foreign Bank's purported additional $50 million investment when in fact it had terminated its investment, and Staisil's status as a wealthy, satisfied GCR investor when in reality he had never invested in GCR, was not wealthy, and was living off of the money he made from recruiting GCR investors—important in deciding whether to purchase the Securities.

98.     The untrue statements of material fact and material omissions described herein were made in the offer or sale and in connection with the purchase or sale of securities.

99.     In connection with the conduct described herein, Staisil acted knowingly and/or recklessly.  Staisil knew and/or was reckless in not knowing that he was making material misrepresentations, omitting to state material facts necessary to make certain statements not misleading under the circumstances, using one or more devices, schemes, and artifices to defraud investors, and engaging in one or more acts, transactions, practices, or courses of business that operated as a fraud or deceit upon investors.

100.     In connection with certain conduct described herein, Staisil acted negligently. Staisil knew or should have known that he obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaging in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

101.     Staisil obtained money or property by means of untrue statements of material fact and omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including by obtaining money from Merrill as transaction-based compensation.

102.     Staisil used devices, schemes, and artifices to defraud investors, and engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon investors.  In addition to the numerous misrepresentations discussed herein, among other things, Staisil created and portrayed a fake persona of a wealthy, satisfied GCR investor that he used to try to entice prospective GCR investors.

103.     Staisil is a natural person who was not associated with a broker or dealer that is a person other than a natural person during the period of the Merrill-Ledford Scheme.

104.     Staisil made use of the mails or any means or instrumentality of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, the Securities without being registered with the Commission as a broker.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

105.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 104.

106.     Staisil, directly or indirectly, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

107.     By reason of the foregoing, Staisil, directly or indirectly, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

108.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 104.

109.     Staisil, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices,

schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

110.     By reason of the foregoing, Staisil, directly or indirectly, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM FOR RELIEF**
**Violations of Exchange Act Section 15(a)**

111.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 104.

112.     Staisil, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while he was not registered with the Commission as a broker or dealer or when he was not associated with an entity registered with the Commission as a broker-dealer.

113.     By reason of the foregoing, Staisil has violated, and, unless enjoined, will again violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

A.     Permanently enjoining Staisil from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C.

18

§ 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)]; and Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

B.      Ordering Staisil to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

C.      Ordering Staisil to pay civil monetary penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.      Retaining jurisdiction of this action for purposes of enforcing any final judgment and orders; and

E.      Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Commission hereby requests a trial by jury.

Dated:      September 30, 2020                    Respectfully submitted,


                                                 /s/ Mark R. Sylvester
                                                 Mark R. Sylvester
                                                 Securities and Exchange Commission
                                                 200 Vesey Street, Suite 400
                                                 New York, NY 10281
                                                 (212) 336-0159 (telephone)
                                                 (301) 623-1193 (facsimile)
                                                 sylvesterm@sec.gov

                                                 Scott A. Thompson
                                                 Jennifer Chun Barry
                                                 Julia C. Green
                                                 Norman P. Ostrove
                                                 Securities and Exchange Commission
                                                 1617 JFK Blvd., Suite 520
                                                 Philadelphia, Pennsylvania  19103
                                                 (215) 597-3100 (telephone)
                                                 (215) 597-2740 (facsimile)
                                                 thompsons@sec.gov
                                                 barryj@sec.gov
                                                 greenju@sec.gov
                                                 ostroven@sec.gov

                                                 *Attorneys for Plaintiff*
                                                 *Securities and Exchange Commission*